**NORTHWEST PUBLICATIONS, INC., Plaintiff, Counter-Defendant, Appellee, Cross-Appellant,**

v.

**John D. CRUMB, Daniel E. Poulson, Hazel Romans, and Angelina R. Ortiz, Defendants, Counterclaimants, Appellants, and Cross-Appellees.**

Nos. 84–1739, 84–1788.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1984.

Decided Feb. 1, 1985.

Joel Linzner, Khourie & Crew, San Francisco, Cal., for plaintiff, counter-defendant, appellee, cross-appellant.

* Of the Central District of California.

Timothy H. Fine, Patrick J. Carter, San Francisco, Cal., for defendants, counter-claimants, appellants, and cross-appellees.

Before WRIGHT and POOLE, Circuit Judges, and TAKASUGI *, District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Northwest Publications, Inc. (Northwest), a newspaper publisher, sought a declaratory judgment that it had cured an alleged violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants, independent newspaper distributors (collectively Distributors), counterclaimed for damages from the antitrust violation. The district court, 587 F.Supp. 1123, ruled that the price-fixing provision in the distributorship agreement constituted resale price maintenance, a *per se* violation of the Sherman Act. Because Distributors failed to establish causation, the court did not award damages under section 4 of the Clayton Act. 15 U.S.C. § 15.

The issues on appeal: (1) was the court correct in applying a *per se* rule to the vertical maximum price-fixing clause; (2) does evidence support the court's finding that Distributors would not have raised their prices absent the illegal price-fixing clause?

**FACTS:**

Northwest contracted with Distributors to sell its newspapers to subscribers. Paragraph four of those contracts stated:

> The Distributor shall distribute his papers promptly and only within the above territory and only at the applicable rate.

The district court found this price-fixing clause was a *per se* violation of § 1 of the Sherman Act, 15 U.S.C. § 1, in a 1975 order granting partial summary judgment to Distributors. Northwest's motion for reconsideration of this order was denied. The court assessed no damages, however, because it found that Distributors had demon-

strated no causal link between the violation and any damage.

Distributors appeal the denial of damages. Northwest cross-appeals the finding of a *per se* violation.

The contracts between Northwest and Distributors were made between 1967 and 1972. In May 1973, Distributors' counsel wrote to Northwest that paragraph four of the agreement violated the antitrust laws and he informed Distributors that they were free to raise or lower their prices. On March 1, 1974, distributor Daniel Pouson announced a price increase to subscribers.

On March 28, 1974, Northwest informed all 19 Distributors that it intended to terminate the distributorship agreements pursuant to a 30-day termination clause and that it was converting to an employee system of distribution in order to control prices to subscribers. On that day it sought a declaratory judgment to determine the legality of this course of action. The termination letters delayed implementation pending resolution of the legal dispute. During the ensuing months, all named defendants raised subscription prices over the publisher's suggested price, causing great losses in circulation.

On October 28, 1974, Northwest notified Distributors of its intention to terminate their distributorships in one month. Distributors responded by counterclaiming for damages and an injunction against their termination. The parties then stipulated to a preliminary injunction which prohibited Northwest from terminating the distributorships absent good cause, including circulation falling below a certain level, and which allowed Distributors to set their subscription prices.

Final resolution of Northwest's action for a declaratory judgment and Distributors' cross-claim for damages resulting from the alleged violation of the antitrust laws was delayed pending resolution of a parallel case, *Knutson v. Daily Review, Inc.*, 383 F.Supp. 1346 (N.D.Cal.1974), *rev'd in part,* 548 F.2d 795 (9th Cir.1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), (*Knutson I*) *on remand,* 468 F.Supp. 226 (N.D.Cal.1979), *aff'd,* 664 F.2d 1120 (9th Cir.1981) (*Knutson II*).

**Price-Fixing Clause**

■ The Supreme Court has stated unequivocally that vertical maximum price-fixing in contracts between a newspaper and its distributors is illegal *per se.* *Albrecht v. Herald Co.*, 390 U.S. 145, 151–54, 88 S.Ct. 869, 872–74, 19 L.Ed.2d 998 (1968). The *per se* rule offers advantages for some types of offenses because it reduces the cost of litigation and helps businesses to conform their behavior to the law. *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343–44, 102 S.Ct. 2466, 2472–73, 73 L.Ed.2d 48 (1982). There are no facts that distinguish *Albrecht* from the instant case.

The Court in *Albrecht* reaffirmed its view that maximum price-fixing is as pernicious as minimum price-fixing. *Albrecht,* 390 U.S. at 152, 88 S.Ct. at 872. One evil of maximum price-fixing is that it substitutes the seller's judgment for market forces. It may also prevent the dealer from furnishing optimal services, and it may channel distribution through large or specifically advantaged dealers. *Id.* at 152–53, 88 S.Ct. at 872–74.

Northwest argues that the *per se* rule for maximum vertical price-fixing should be abolished. Although maximum vertical price-fixing arguably benefits consumers, the intended beneficiaries of the antitrust laws, we may not reject the clear precedent of *Albrecht* and its progeny.

No cases indicate an abandonment of *Albrecht,* and its rule has been reiterated. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 102, 100 S.Ct. 937, 941, 63 L.Ed.2d 233 (1980); *Maricopa County Medical Society,* 457 U.S. at 347, 102 S.Ct. at 2474; *see also Blanton v. Mobil Oil Co.,* 721 F.2d 1207, 1211 (9th Cir.1983).

**Causation**

Distributors claim as damages the difference between the profits they would have

made but for the illegal clause and their actual profits. The district court assumed that Distributors did sustain damages for a period up to 60 days, but found that they failed to establish that those were caused by the price-fixing clause.

■ Causal antitrust injury is an essential element of any remedy under the Sherman Act. *See Blanton*, 721 F.2d at 1215. It is generally sufficient to show with reasonable probability some causal connection between the antitrust violation and a loss of income. *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

■ Once illegal price-fixing by a publisher is proved, we presume that its distributors would have been profit-maximizers without the illegal constraint. This presumption may be rebutted by showing that the distributors would not have raised their prices absent the illegal activity. *Knutson I*, 548 F.2d at 812; *Knutson II*, 468 F.Supp. at 234. Some other, entirely legal, competitive market force may prevent the distributors from raising their prices.

The profit-maximizing price for a distributor is not necessarily the same as that of the publisher. The distributor seeks to maximize subscription revenue. He may be willing to lose some customers to charge more to remaining subscribers.

The publisher, on the other hand, obtains revenues from advertising as well as subscriptions. Advertisers pay more for space in a paper with higher circulation. The publisher, unlike the independent distributor, must strike a profit-maximizing balance between subscription and advertising revenue.

The publisher's concern about this profit-maximizing balance may produce a termination clause in distributors' contracts. *See Knutson II*, 468 F.Supp. at 238; *see also Knutson I*, 548 F.2d at 804–05. This is a legal, competitive market force which may prevent distributors from maximizing their short-term profits.

Short-term termination clauses are a sufficient market force to affect the distributors' decisions if the distributors are: (a) generally sophisticated business persons aware of the balance between advertising and circulation revenue, and (2) aware of the possibility that the publisher may terminate them on short notice. *Knutson II*, 468 F.Supp. at 239.

It is evident from the record, as the trial court found, that Distributors had the sophistication to understand the consequences of a price increase. They testified that they were aware of the relationship between circulation and advertising revenue and of the publisher's dependence on the latter for the bulk of its income. Distributors also testified they would not have raised prices, but implicated the illegal clause as the reason. The trial court discounted this testimony insofar as it contradicted the economic relationship between publisher and distributor.

■ The court found that Distributors were constrained by market forces rather than the price-fixing clauses. Their behavior in the post-damage period amply supports this finding.

Although Distributors knew in May 1973 that the price-fixing clause was illegal, the first price increase did not occur until April 1974. Distributors explained that their attorney was negotiating a rate reduction which would increase their profit margin without raising prices. The district court found the explanation less than convincing.

Testimony at trial supports the court's determination. Northwest's employees testified that they would immediately terminate distributors who increased prices because of the resulting loss of advertising revenue and anticipated customer complaints. The distributors knew that.

The publisher's conduct during the post-damage period lends support to the findings. In response to the first price increase, the publisher took immediate steps to terminate the dealers. The delay in implementation was due solely to concerns over the legality of the clauses in question.

Finally, the trial court found that, due to competitive forces, the distributors would choose the same long-range price as that which the publisher chooses. The publisher set a price that would maintain the stability of the paper, reflecting a balance between circulation and advertising revenue. Sophisticated distributors, who understand this price-balancing and their own long-term interests, also would use that price to maintain their position as distributors.

Distributors argue that under *Knutson*, the court is required to find causation, and that the profit-maximizing assumptions regarding their behavior absent the price-fixing clause can go only to the amount of damages. This argument rests on a misunderstanding of the *Knutson* cases.

"Before" and "after" evidence is an acceptable means to show causation. *Knutson I*, 548 F.2d at 810–13. Even if the inherent artificiality of this evidence diminishes its usefulness in proving the amount of damages, if *any* damages are proven using this method, causation is established. *Id.* at 812–13; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969).

Distributors' only evidence on causation was tax returns which indicated that their profits were greater after the entering of the preliminary injunction, allowing them to set their own prices, than before. As in *Knutson*, the district court did not find this evidence sufficient to establish causation because of the long delay before any price increase after the clause was found illegal. *See Knutson I*, 548 F.2d at 810–13.

The court specifically rejected the testimony of Distributors' economic expert, Dr. David Bradwell, as unsupported by the evidence. The weight to be given expert testimony is solely for the trial court to determine. *Harries v. United States*, 350 F.2d 231, 235 (9th Cir.1965).

Distributors' testimony after the fact was based on profits made while they were protected by the preliminary injunction. Although under normal circumstances Northwest would have terminated Distributors for any price increase, it could not do so during the injunction without an actual decrease in subscriptions. Distributors knew of this artificial constraint on Northwest.

The burden on Distributors to show causation is more stringent than the burden to prove the amount of damages. *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir.1957) (cited by *Knutson I*, 548 F.2d at 811–12). *See also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 250–51, 75 L.Ed.2d 544 (1931). Distributors did not sustain the burden.

**CONCLUSION:**

The behavior of the publisher and the distributors fits the economic model so well described in *Knutson II*. 468 F.Supp. at 235–41. Maximum vertical price-fixing remains a *per se* antitrust violation. Causation has not been established when competitive forces in the market force distributors to hold down prices.

AFFIRMED.